UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| BRADLEY JOSEPH KING | ) | |
| | ) | |
| V. | ) | NO. 2:14-CV-317 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The Plaintiff filed applications for disability insurance benefits and supplemental security income under the Social Security Act which were denied following a hearing before an Administrative Law Judge ["ALJ"]. Both the Plaintiff and the Commissioner have filed Motions for Summary Judgment [Docs. 13 and 15].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was a younger individual under the applicable regulations at the time of the alleged onset date of his disability of January 31, 2012, and remains so today. He has a high school education and all parties agree that he cannot return to his past relevant work.

Plaintiff's medical history is recounted in the Commissioner's brief as follows:

> In December 2008, three years before his alleged onset date, Plaintiff spent five days in a hospital after reports of drinking alcohol and suicidal ideations (Tr. 165-74). He had a history of depression and drug use, and received mental health treatment with Eric D. Moffet, M.D. (Tr. 173). Plaintiff's condition improved with treatment and he was no longer suicidal after the effects of alcohol wore off (Tr. 165). Following inpatient treatment, Plaintiff stated that he no longer felt depressed (Tr. 166). At the time of discharge, Plaintiff was pleasant and cooperative (Tr. 166). He denied any suicidal thoughts or plans and showed no signs or symptoms of psychosis (Tr. 166). Plaintiff was assessed with a discharge diagnosis of bipolar disorder, alcohol abuse, benzodiazepine dependence, marital strain, and a history of posttraumatic stress disorder in partial remission (Tr. 165). Plaintiff received a global assessment of functioning (GAF) score of 30 on admission and 50 at the time of discharge (Tr. 165).
> Plaintiff followed up with Dr. Moffet every few months for medication adjustments and refills between July 2009 and November 2011 (Tr. 232-54). Dr. Moffet assessed Plaintiff with bipolar disorder and GAF scores of between 45 and 50 (Tr. 232, 234, 236, 237, 238, 242, 244, 245, 246, 247, 248, 249). Mental status examinations revealed normal appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment (Tr. 232, 234, 236, 237, 239, 241, 242, 243, 245,

246, 247, 248, 249, 250, 252, 253). In 2011, Plaintiff had an anxious, depressed, and irritable mood (Tr. 238, 240, 244). He reported checking into the emergency room with thoughts of hurting himself in May 2011 (Tr. 240).

In February 2012, Plaintiff was admitted to a hospital with feelings of hopelessness, increased anxiety, and some suicidal thoughts (Tr. 176). He felt increasingly distressed and overwhelmed secondary to multiple stressors including stress at work, a pending application for disability, and poor coping skills (Tr. 176). He also felt that his supervisors were out to get him and he might be fired (Tr. 178). He reported hearing voices and feeling of restlessness, anxiety, and mood swings (Tr. 178). He had a history of alcohol abuse, but stated that he had been sober for several years (Tr.180). Plaintiff spent five days in the hospital, working on improving coping skills and resolving stressors (Tr. 176-220). He participated in and was verbal in group therapy (Tr. 177, 188). His anxiety decreased with treatment and he reported no side effects from medication (Tr. 193, 195). Upon discharge, Plaintiff denied any suicidal ideation, paranoia, psychosis, or mania (Tr. 177). He was assessed with a GAF of 20-30 on admission and a GAF of 70 at discharge (Tr. 176). Plaintiff received a discharge diagnosis of bipolar disorder and anxiety disorder and was advised to follow up with Dr. Moffet (Tr. 176-77).

In a functional report completed in March 2012, Plaintiff stated that his daily activities included taking medication, doing chores, playing guitar, and watching television (Tr. 132, 134). He had no problems in personal care and went outside several times a day (Tr. 133-34). He could drive, but did not go out alone due to panic attacks and nervousness (Tr. 134). He spent time with his wife and kids and needed reminders to go to the pharmacy and doctor appointments (Tr. 135). Plaintiff reported that he was easily angered and had no social activities (Tr. 136). He stated he had problems talking, completing tasks, concentration, understanding, following instructions, and getting along with others (Tr. 136).

Plaintiff visited Dr. Moffet for mental health treatment in March, April, and May 2012 (Tr. 292-94). Plaintiff generally had a normal appearance, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment (Tr. 292-94). Plaintiff's mood appeared anxious and depressed in March and May, but euthymic in April (Tr. 292-94). Dr. Moffet assessed Plaintiff with GAF scores of 50 (Tr. 292-94).

On May 8, 2012, Plaintiff underwent a psychological evaluation with Steven Lawhon, Psy.D. (Tr. 259-62). Plaintiff reported panic attacks and nervous stress (Tr. 259). He stated that he had marital problems and a past history of alcohol and drug abuse (Tr. 260). Plaintiff reported that he occasionally cooked, washed dishes, cleaned, did laundry, and went to the grocery store with others (Tr. 261). He mowed the yard, watched television, and played his guitar (Tr. 261). He stated he rested on a bad day and did household chores on a good day (Tr. 261). He stated that he felt "kind of normal" (Tr. 261). Upon examination, Plaintiff's affect and mood appeared anxious and depressed (Tr. 260). He reported mood swings with episodes of anger and auditory hallucinations of a female voice

(Tr. 260). His short term memory appeared intact and his intellectual functioning appeared in the average range (Tr. 260). He had the ability to relate to others but reported losing contact with friends (Tr. 261). Dr. Lawhon assessed Plaintiff with bipolar disorder with psychosis and a GAF score of 55 with a past GAF of 65 (Tr. 261-62). Dr. Lawhon found no sufficient evidence of panic disorder (Tr. 262). He opined that Plaintiff's social interaction and ability to understand and remember was not significantly limited (Tr. 261). His work adaption and ability to sustain concentration and persistence was significantly limited (Tr. 261).

On May 17, 2012, Fawz Schoup, Ph.D., a state agency psychological consultant, reviewed the medical record and completed a psychological review and mental RFC assessment (Tr. 263-79). Dr. Schoup opined that Plaintiff could understand and remember detailed but not multi-step tasks (Tr. 279). Plaintiff could maintain attention and concentration for detailed but not multi-step detailed tasks (Tr. 279). Dr. Schoup found that Plaintiff should not work directly with the public and would work better with things than with people (Tr. 279). He also opined that Plaintiff could adapt to gradual change (Tr. 279). On July 17, 2012, Frank Kupstas, Ph.D., a state agency psychological consultant, affirmed Dr. Schoup's assessment during the reconsideration stage of Plaintiff's appeal (Tr. 295).

Plaintiff returned to see Dr. Moffet on several occasions between July 2012 and March 2013 (Tr. 314-20, 340). At each visit, Plaintiff had a normal appearance, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment (Tr. 314, 316-17, 319-20, 340). In September 2012, Plaintiff had an appropriate affect and euthymic mood (Tr. 319). In January 2013, Plaintiff had an appropriate and blunted affect, and an anxious and depressed mood (Tr. 316-17). The following month, Plaintiff had an appropriate affect, and euthymic and anxious mood (Tr. 314). In March 2013, Plaintiff had a blunted affect, and anxious and depressed mood (Tr. 340). Dr. Moffet continually assessed GAF scores of 50 (Tr. 314, 316-17, 319-20, 340).

In March 2013, Dr. Moffet completed a mental functional capacity questionnaire (Tr. 322-26). Dr. Moffet indicated that he saw Plaintiff on monthly basis for medication management and psychotherapy (Tr. 322). He opined that Plaintiff got confused with simple instructions and had difficulty following and understanding rules and instructions (Tr. 322). Dr. Moffet indicated that Plaintiff's judgment was poor and he was quite anxious around other people and unable to cope or deal with the public (Tr. 322). Dr. Moffet stated that Plaintiff's prognosis was poor and he was unable to maintain any gainful employment (Tr. 322). On a questionnaire form, Dr. Moffet indicated that Plaintiff was "unable to meet competitive standards" or had "no useful ability" to function in 18 of 20 categories (Tr. 324-25). He opined that Plaintiff would be absent from work more than four days a month (Tr. 326).

Dr. Moffet also completed an assessment of Plaintiff's ability to do work-related activities (mental) (Tr. 327-28). On this form, Dr. Moffet opined that Plaintiff had "poor/none" ability to follow work rules; relate to coworkers; deal

4

with public; use judgment with the public; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; understand and remember detailed or complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability (Tr. 327-28). He stated that Plaintiff had a "fair" ability to understand and remember simple job instructions, and maintain his personal appearance (Tr. 328).

Around the same time, Dr. Moffet wrote a letter to Plaintiff's congressman, indicating that Plaintiff's condition had deteriorated over the past couple of years (Tr. 329). Dr. Moffet opined that Plaintiff had extremely poor coping skills and chronic suicidal ideation (Tr. 329). Dr. Moffet stated that Plaintiff's temper and anger issues caused him to be at risk for harm to himself and coworkers when placed under stress in the workplace (Tr. 329). He opined that Plaintiff was not able to maintain gainful employment and was "100% totally and permanently disabled" (Tr. 330).

[Doc. 16, pgs. 2-7].

Evidence was also presented to the Appeals Council following the ALJ's adverse decision on Plaintiff's applications. This evidence is also set out in defendant's brief as follows:

Plaintiff returned to see Dr. Moffet in May, June, July, and August 2013 (Tr. 332-39). Plaintiff generally had a normal appearance, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment (Tr. 334, 335-36, 337, 339). In May 2013, Plaintiff had a blunted affect, and an anxious and depressed mood (Tr. 339). In June 2013, Plaintiff's wife called Dr. Moffet's office and reported that Plaintiff was drinking significantly and they were getting divorced (Tr. 338). At his next appointment, Plaintiff had an appropriate affect and euthymic mood (Tr. 337). The following month, Plaintiff had an appropriate and blunted affect, and an anxious, depressed, and irritable mood (Tr. 335-36). In August 2013, Plaintiff had an appropriate affect and euthymic mood (Tr. 334). Dr. Moffet continually assessed Plaintiff with GAF scores of 50 (Tr. 334-39).

[Doc. 16, pg. 8].

The administrative hearing was held June 17, 2013. Mr. King testified. After he testified, the ALJ took the testimony of Adrian Bentley Hankins, a vocational expert

5

["VE"]. The VE first identified the requirements of the Plaintiff's past relevant work. (Tr. 42). The ALJ then asked the VE to assume a person of Plaintiff's age, educational level and work experience. He then asked him to assume that "this person has no exertional limitations; limited to simple, routine, repetitive work; better with things than people; with no public contact at all." When asked if there would be jobs, the VE identified well over one million jobs in the national economy and over a thousand in the regional economy. If Plaintiff's testimony regarding his limitations was correct, the VE stated it was "unlikely he could sustain employment." (Tr. 43-44). He was then asked by Plaintiff's counsel if his answer as to available jobs would change if the Plaintiff had the limitations opined by Dr. Moffit, the Plaintiff's treating physician. He opined that if the Plaintiff were so impaired, then he could not engage in competitive employment. (Tr. 44).

On July 15, 2013, the ALJ rendered his hearing decision denying the Plaintiff's applications. After outlining the history of the Plaintiff's claims, and the steps in the adjudicative process, the ALJ found that the Plaintiff had "severe combination of impairments," consisting of bipolar disorder and anxiety disorder. (Tr. 21).

The ALJ then stated that the Plaintiff did not have an impairment or combination of impairments which met one of the impairments listed in 20 CFR Part 404, Subpart P. Appendix 1. In the process of doing this required analysis, he stated that Plaintiff's impairments did not meet or equal Sections 12.04 or 12.06 of the listing of mental impairments. To do this, he had to consider, under the "paragraph B" criteria of those

6

listings, the degree of limitation imposed by Plaintiff's impairments in the areas of activities of daily living; social functioning; concentration, persistence or pace; and whether the Plaintiff has experienced episodes of decompensation. In order to meet the B criteria of those listings, a claimant must have "marked" limitations in at least two of the three functional areas, or in one of them along with "repeated" episodes of decompensation. "Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 21).

The ALJ found that the Plaintiff had a mild restriction in his activities of daily living. He found this based upon the Plaintiff's daily activities, which included preparing meals, caring for his children and taking them places, driving, watching television and playing the guitar occasionally. With respect to social functioning, the ALJ found that the Plaintiff has moderate difficulties. Regarding concentration, persistence or pace, the ALJ also found that the Plaintiff has moderate difficulties. He noted that while Dr. Lawhon in his consultative examination had opined that the Plaintiff was "limited" in this respect, the ALJ found that the evidence did not suggest more than a moderate limitation. He found that the Plaintiff had "experienced one or two episodes of decompensation," which were not enough to satisfy the "repeated" requirement outlined above. (Tr. 21-22).

The ALJ then stated that the Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations which limited him to simple, routine, repetitive work working better with things than

7

people with no public contact at all. (Tr. 22). In doing this, the ALJ follows a two-step process. First, he had to determine whether the Plaintiff had an underlying medically determinable mental impairment "that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms." (Tr. 22). Second, if there were such a mental impairment, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." *Id.* If the ALJ found that the "statements about the intensity, persistence, or functional limiting effects" of the Plaintiff's mental impairments were "not substantiated by objective medical evidence," then he must make a finding on the Plaintiff's credibility based upon "the entire case record." (Tr. 22).

While the ALJ found that the Plaintiff's impairments of bipolar disorder and anxiety disorder could be expected to cause some symptoms, he found "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible…." (Tr. 23). In this regard, the ALJ recounted the medical evidence. He noted that before the onset date, Plaintiff was hospitalized for suicidal ideation in December of 2008, where he was diagnosed with bipolar disorder and assigned a Global Assessment of Functioning ["GAF"] score of 50, which the ALJ said would indicate "serious symptoms or serious impairment in social, occupational, or school functioning." (Tr. 23).

Within the period since the alleged onset date, the ALJ stated that the Plaintiff was

once again hospitalized for suicidal ideation.  The ALJ noted that the Plaintiff was stable at discharge and had a GAF of 70, indicative of "mild symptoms." (TR 23)

He discussed the treatment Plaintiff received from Dr. Moffet.  He noted that Dr. Moffet consistently opined that the Plaintiff had a GAF of 50.  However, the ALJ stated that "Dr. Moffet's treatment notes for the claimant indicate that the claimant's mental status examinations were generally benign with intact sensorium and memory, unremarkable thought content, and normal judgment."  (Tr. 23). The ALJ stated that Plaintiff testified that medication was helpful.  He then stated that the record "fails to establish greater than moderate limitations or difficulty" in the areas of social functioning or concentration, persistence or pace.  Therefore, he found that the Plaintiff was not credible in all respects.  (Tr. 24).

He then discussed Dr. Moffet's March 6, 2013, letter.  The ALJ prefaced his holding saying that "although not reflected by Dr. Moffet's mental status examinations of the claimant or the treatment record for the period at issue," the letter from him indicated that the Plaintiff has very serious mental limitations brought about by his bipolar condition in a wide variety of areas, including understanding even simple instructions or coping, with serious temper and anger issues (Tr. 24).  The ALJ then talked about the mental evaluation of March 8, 2013 completed by Dr. Moffet, stating that it was "inconsistent with recorded mental status examinations since the alleged onset date of disability of January 31, 2012."  Noting that Dr. Moffet had treated the Plaintiff since December 2006 and saw Plaintiff on a monthly basis for medication management and

9

psychotherapy, the ALJ recounted Dr. Moffet's opinions in that assessment. (Tr. 24-25).

The ALJ then discussed the consultative exam of Dr. Lawhon. He recounted the findings in the written report, such as daily activities and Plaintiff's ability to name three presidents, identify the colors in the American flag, and knew the shape of a ball. The ALJ noted that Dr. Lawhon found that the Plaintiff's "affect and mood were anxious and depressed," and that Plaintiff had "suicidal ideas" and serious mood swings. (Tr. 25). The ALJ stated that Dr. Lawhon gave Plaintiff a GAF of 55, which the ALJ says indicated moderate symptoms or difficulty in social, occupation or school functioning. He recounted Dr. Lawhon's conclusions that the Plaintiff was not significantly limited in his ability to understand and remember and in social interaction, and that the Plaintiff did have significant limitations in sustaining concentration and persistence, and in work adaptation skills. (Tr. 25).

The ALJ then noted the findings of the State agency psychologists that the Plaintiff could "understand and remember detailed but not multi-step detailed tasks; maintain attention and concentration for the above tasks; should not work directly with the general public and will work better with things than with people; and can adapt to gradual change." (Tr. 25). The Court notes that the State agency psychologists found the Plaintiff had moderate limitations in his activities of daily living, unlike the ALJ, who opined that the Plaintiff only had a mild restriction in this area. (Tr. 273).

The ALJ then spoke of the weight he gave to expert medical opinions in the record. He found the State agency psychologists were entitled to great weight

"concerning the claimant's social functioning," which they found was moderate, but entitled to little weight in all other respects "because it was not well supported by medically acceptable findings and is inconsistent with the medical evidence." (Tr. 25). Presumably, the ALJ was speaking here of their finding that the Plaintiff had moderate difficulties in activities of daily living, and that Plaintiff could understand and remember for detailed but not multi-step tasks. (Tr. 279).

The ALJ then stated that "little weight has been given to the assessments of Dr. Moffet because they are inconsistent with the totality of the medical evidence of record." (Tr. 26). He explained this by stating that "[t]reatment notes from Dr. Moffet generally indicate that claimant's mental status examinations were essentially benign with intact sensorium and memory, unremarkable thought content, and normal judgment." (Tr. 26). Also, the ALJ noted that the Plaintiff testified that his mental health treatment from Dr. Moffet was helpful. (Tr. 26).

The ALJ accorded little weight to Dr. Lawhon saying that "it is inconsistent with the totality of the medical evidence of record." (Tr. 26). While the ALJ considered the GAF scores he gave them little weight because they were "variable and inconsistent with the totality of the evidence which shows that the claimant was improved with treatment." (Tr. 26). In any event, he stated that "the Commissioner has declined to endorse the GAF scale for use in disability programs, and has stated that the GAF scale" didn't have direct correlation to severity requirements regarding the Commissioner's listing of mental disorders. (Tr. 26). Finally, the ALJ gave the GAF scores "little weight because they are

11

not stated in functional terms and require an inappropriate interpretation." (Tr. 26).

Thus, the ALJ found the record and the law supported his RFC finding. While the Plaintiff could not perform his past relevant work, the testimony of the VE indicated that there were jobs he could perform with his RFC. Accordingly, the ALJ found that he was not disabled. (Tr. 26-28).

Plaintiff asserts that the ALJ did not give proper weight to Dr. Moffet under the applicable law. Plaintiff maintains that he should have given him controlling weight as the Plaintiff's long time treating psychiatrist, and that he erred by not giving sufficient reasons for his failure to do so. Even if it was proper to not accord him controlling weight as a treating physician, Plaintiff asserts that the ALJ still failed to evaluate Dr. Moffet's opinion as a medical source. Plaintiff asserts that these errors were not harmless. He also asserts that proper weight was not given to the opinion of Dr. Lawhon. He argues that the GAF findings support the opinions of these mental health professionals, and that in rejecting these opinions of the treating psychiatrist and the consultative examining psychologist, the ALJ substituted his own opinion as to the extent of the limitations imposed by Plaintiff's mental impairments for those of the professionals.

With respect to Dr. Moffet, the Plaintiff points out that Dr. Moffet's treatment notes were not perceived by Dr. Moffet as being as "benign" as they were categorized by the ALJ. For example, on February 1, 2012, Dr. Moffet stated that the Plaintiff had a normal appearance, with unremarkable thought content and linear thought processes, with

12

a blunted affect, and an anxious and depressed appearance (Tr. 229). On that same day, at the same time as he made those observations, Dr. Moffet recommended that Plaintiff be admitted to Ridgeview Pavilion, a mental hospital (Tr. 228), which in fact took place. The admitting psychiatrist at Ridgeview, Dr. Liquete, made the same "benign" observations of good grooming and dress and insight and judgment, but totally agreed that the Plaintiff should be admitted to provide "a safe and secure environment," to support Plaintiff "throughout his period of decompensation." (Tr. 179). Ridgeview did not discharge the Plaintiff until February 6, 2012 (Tr. 176). Interesting is the fact that on Plaintiff's next three visits to Dr. Moffet, on February 7th (Tr. 227), February23rd (Tr. 226), and March 21st (Tr. 225), Dr. Moffet's mental status evaluation perceptions were virtually identical to those of the February 1st note which led to the Plaintiff's hospitalization.

Thus, with very similar, and benign, "mental status examination" findings, not only Dr. Moffet, but also Dr. Liquete, concurred that the Plaintiff should have been admitted to a mental hospital and given extensive treatment for the danger Plaintiff was to himself and his family. The only possible conclusion is that the treatment notes regarding mental status examination are not as indicative of a benign and uneventful situation as the ALJ, a layman, perceived that they were.

Admittedly, the State agency psychologists, who reviewed the records of Dr. Moffet and Dr. Lawhon, and thus were familiar with the Plaintiff's stay at Ridgeview, opined that the Plaintiff had lesser limitations than did Dr. Moffet in his evaluation. This

13

could arguably tip the scales and deprive Dr. Moffet's opinion of controlling weight. However, since the above-described "benign" mental status examinations and the Plaintiff's testimony that Dr. Moffet's treatment was helpful were the sole reasons the ALJ gave for giving Dr. Moffet "little weight," the Court finds that it was error for the ALJ to not give him more weight or provide more reasons than those for deciding to give him little weight.

As for the weight given to Dr. Lawhon, the Court can understand that his opinion is somewhat "vague" as characterized by the State agency psychologist (Tr. 275), and thus not of great value in arriving at a mental RFC. However, what there is of the opinion supports at least some of Dr. Moffet's opinions.

The central problem lies with the fact that the ALJ did not give great weight to any of the mental health professionals who evaluated the Plaintiff other than certain of the findings of the State agency psychologists. With Dr. Moffet and Dr. Lawhon given little weight, and the State agency psychologists being accorded weight in very limited areas, where is the expert opinion that supports all of the ALJ's findings? All three sources opined that the Plaintiff had greater limitations than those found by the ALJ.

The Court will admit that there is a serious temptation to recommend that the Commissioner's final decision be reversed and the case remanded for an award of benefits. However, given that there is still great confusion as to the degree of severity of the Plaintiff's condition, and given that it is not a forgone conclusion that the present opinion of the State agency psychologists could not support an RFC which would still

14

allow the VE to opine that the Plaintiff could perform a significant number jobs, the better course is to remand to the Commissioner for further evaluation of the Plaintiff's mental impairments.  In this regard, further evidence can be submitted by both the Plaintiff and the Commissioner.  However, substantial evidence from medical sources in the present record simply does not support the present RFC finding of the ALJ.  This was not a substantially justified position.

Accordingly, it is respectfully recommended that the case be remanded to the Commissioner for further evaluation of the Plaintiff's mental limitations. Therefore, it is respectfully recommended that the Plaintiff's Motion for Summary Judgment [Doc. 13] be GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 15] be DENIED.[1]

> Respectfully submitted,
>
> s/Clifton L. Corker
> United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).

15